399 F.Supp. 330 (1975)
R. L. POHLMAN COMPANY, Plaintiff,
v.
KEYSTONE CONSOLIDATED INDUSTRIES, INC., a corporation (d/b/a Impex Division of Keystone Consolidated Industries), Defendant.
No. 74-58C(3).
United States District Court, E. D. Missouri, E. D.
July 3, 1975.
*331 R. W. Jacobsmeyer, Leyhe, Jacobsmeyer & Meyer, Clayton, Mo., for plaintiff.
Dominic Troiani, James W. Herron, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for a decision on the merits following the trial to the Court sitting without a jury.
Plaintiff, R. L. Pohlman Company, brought this contract action seeking cover and incidental damages for the failure to deliver a quantity of extruded aluminum blanks against defendant, Keystone Consolidated Industries, Inc. Defendant has in turn counterclaimed for failure to pay for a shipment of the extruded aluminum blanks.
The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, R. L. Pohlman Company is a corporation organized and existing under the laws of the State of Missouri with its principal place of business in St. Louis County, Missouri.
2. Defendant, Keystone Consolidated Industries, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Peoria, Illinois.
3. At all times relevant, Impex Division of Keystone Consolidated Industries, Inc.'s principal place of business was in Crawfordsville, Indiana.
4. On or about August 7, 1972, the United States Army Munitions Command, Joliet, Illinois, issued an invitation for bid, Bid No. DAAA09-73-B-0008 for 1,025,000 Cup Booster F/Fuse, Bomb Nose N904E3.
*332 5. The basic manufacturing process in manufacturing Cup Boosters is:
A. The raw material used in the manufacture of a Cup Booster is an aluminum slug.
B. The aluminum slug is manufactured into a Cup Booster Blank (hereinafter referred to as a Blank) on an impact machine.
C. The Blank is then machined and coated to make the finished Cup Booster (hereinafter referred to as a Finished Booster Cup) furnished to the government.
6. For several years prior to August 1972, defendant had been awarded contracts by the United States Army for Finished Booster Cups. In these years, defendant secured aluminum slugs from outside suppliers and manufactured both the Blank and the Finished Booster Cups.
7. Both plaintiff and defendant submitted bids in response to the aforesaid invitation for bid for 1,025,000 Finished Booster Cups.
8. On or about August 31, 1972, all bids submitted to the United States Army were opened.
9. Defendant submitted a bid to plaintiff dated September 5, 1972, offering to supply plaintiff Blanks in the event plaintiff was awarded a contract by the Army. The bid was:

 "Lots of 1,000 impact only
 (Blanks) $.145 each
 machined OD .185 each"

10. Mueller Brass Company also sent to plaintiff a letter quotation dated September 12, 1972, offering to supply plaintiff Blanks. The quotation read:

 "1 million pieces $15.30 per
 hundred"

11. On or about October 12, 1972, the United States Army Munitions Command awarded plaintiff a contract for 1,025,000 Finished Booster Cups. At the same time, it also awarded a contract for 1,025,000 Finished Booster Cups to American Technical Industries.
12. Defendant submitted to American Technical Industries, Inc. a quotation offering to also supply American Technical with Blanks.
13. Thereafter, plaintiff orally placed an order with defendant for 500,000 Blanks at a price of $.145 each.
14. Defendant sent to Aluminum Company of America (Alcoa) its Purchase Order No. 47190 dated November 3, 1972, and received from Alcoa a document entitled "Sales Order" dated November 3, 1972.
15. Plaintiff sent to Mueller Brass Company a document entitled "Purchase Order No. 1018" dated November 21, 1972, for 525,000 Blanks upon a certain delivery schedule.
16. On December 11, 1972, plaintiff sent to defendant its Purchase Order ARM1044 which was received by defendant on December 13, 1972. That document contained, among other items, an initial quantity for the Order, 400,000, a delivery schedule, at the price of $.145 each, f.o.b. defendant's plant, and the language after the item description, "with an option for one hundred percent (100%) increase."
17. The defendant was aware of the quantity of Booster Cups required by the contract awarded to plaintiff Pohlman when it submitted its quotations to Pohlman and American Technical Industries. The defendant was also aware of, having the bid packet for the government contract, the fact that the Pohlman contract contained a provision allowing the government to order an increase in quantity of up to, but not exceeding, two hundred percent (200%) of the originally contracted for quantity of Booster Cups.
18. Plaintiff commenced its attempts to produce the Finished Booster Cups in January of 1973, and encountered difficulty in machining the raw material. Because of these difficulties, it placed *333 its delivery schedule for Booster Cup Blanks on hold for both defendant and Mueller Brass Company.
19. On or about August 29, 1973, plaintiff sent to defendant "Change #2" to its Purchase Order in which it exercised its option for and ordered the additional 400,000 Booster Cups to be delivered as soon as possible. That document was received by the defendant on August 31, 1973.
20. On the date that plaintiff sent to defendant the change to the Purchase Order increasing the quantity by 400,000, defendant was still shipping to plaintiff the initial quantity of 400,000 Booster Cup Blanks originally ordered.
21. On or about November 5, 1973, shortly after defendant had shipped the last of the initial 400,000 Booster Cup Blanks, it sent to plaintiff a Purchase Order revision declaring "Consider this order complete at 413,911 pieces shipped".
22. The evidence produced at trial shows that on December 10, 1973, defendant's employee, Howard Fulford, considered his company "out of the business of [producing] Booster Cups."
23. During the time period, as discussed in Findings of Fact paragraphs 19 through 22, plaintiff continued to insist that defendant provide information as to when defendant would ship the additional quantity.
24. Defendant offered to sell to plaintiff the additional 400,000 Booster Cup Blanks on January 11, 1974.
25. That offer to sell by defendant was not acceptable to the plaintiff for several reasons. These reasons were: the proposed delivery schedule of the defendant was not acceptable to the plaintiff because it would force the plaintiff into an unacceptable delivery schedule with regards to the United States Government Procurement Agency for the end item, the Finished Booster Cup; and the defendant's offer also required that an additional 400,000 Booster Cup Blanks (over and above the original option quantity of 400,000) be purchased by the plaintiff.
26. As a result of the aforementioned difficulties with defendant's order conditions, plaintiff placed an order for the Booster Cup Blanks with Mueller Brass Company.
27. The Purchase Order to Mueller Brass Company was for a higher price, initially $.263 each, and allowed the price to be varied in accordance with current aluminum prices. Eventually, plaintiff was paying Mueller Brass Company $.271 each for the Booster Cup Blanks. In total, plaintiff paid to Mueller Brass Company $97,517.50 for the 362,500 Booster Cup Blanks used by the plaintiff to complete the contract. That quantity of Blanks would have cost $52,562.50 at the price of $.145 each, the defendant's contract price. As a result, plaintiff paid $44,955.00 more for the same quantity of Blanks than it would have if the Blanks had been supplied by defendant at the contract price.
28. Mueller's plant is located in Port Huron, Michigan, farther from the City of St. Louis than defendant's plant at Crawfordsville, Indiana. As a result, plaintiff paid an extra $1159.94 in shipping costs as a result of its purchase from Mueller Brass Company.
29. Due to defendant's refusal to sell the optioned Booster Cup Blanks to the plaintiff, plaintiff was required to amend its delivery schedule with the United States government. This delivery schedule change resulted in a contract price reduction from the United States government to plaintiff of $250,000.
30. The plaintiff has failed to pay the defendant for 104,782 Blanks. At the contractual rate of $.145 each defendant is entitled to recover from plaintiff $15,193.39.
31. As discussed in Findings of Fact 27 through 30 above, the Court finds that the plaintiff was damaged in the amount of $45,364.94 which shall be reduced by defendant's counterclaim amount of $15,193.39.

*334 Conclusions of Law

The Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1332.
The central issue in this contract case is the effect to be given the language on plaintiff's Purchase Order to defendant which stated: "400,000 Cup Booster Blank No. 8839359 with an option for 100% increase."
It is defendant's assertion that the option was not exercised within a reasonable time, and, therefore, plaintiff's later order for an additional 400,000 Blanks need not have been accepted by the defendant. In the absence of any specific time perimeters in a contract, it is clear that terms such as options shall be exercised within a reasonable time. § 400.2-309 R.S.Mo., 1969. Absent such a specific time requirement, the reasonable period of time for the exercise of such an option must be considered from the totality of the circumstances submitted to the Court. Weis v. Wanstrath, 149 S.W.2d 442 (Mo. Ct.App., 1941).
It is this Court's opinion after carefully reviewing the factual evidence presented to it that the plaintiff did exercise its option within a reasonable time. The record shows that the defendant was aware of plaintiff's machining problems. The evidence shows that defendant acquiesced and allowed plaintiff to vary its delivery schedule with the defendant. If defendant was aware that it would be damaged by such changes or that it felt that the time to exercise the option had run, it should have so stated to the plaintiff. The Court regards defendant's silence as to the effect of the option as indicating that defendant felt the option was still in force.
Once it is established that the option between the parties remained in effect, it follows that upon defendant's statement to plaintiff that the order for approximately 400,000 Blanks was complete upon shipment of the final delivery, that plaintiff was entitled to seek cover for damages arising out of defendant's breach. § 400.2-712 R.S.Mo., 1969.
As stated in the Findings of Fact, the price that plaintiff had to pay for obtaining substitute goods is clearly established, and such prices will be the main measure of damages for the plaintiff.
The plaintiff also seeks incidental and consequential damages pursuant to § 400.2-715 R.S.Mo., 1969. The costs attributable to extra freight and decrease in the contract price paid by the United States government due to defendant's breach have been clearly identified to the Court and will be allowed. However, plaintiff has attempted to prove other consequential and incidental damages such as transportation of plaintiff's agent in seeking substitution of goods, and "downtime" of plaintiff's machinery due to defendant's failure to deliver the optioned goods. Such damages have not been adequately proved to the satisfaction of the Court since the records involved were clearly prepared at a time inconsistent with defendant's breach.
As to the defendant's counterclaim, the record is clear that plaintiff has failed to make the necessary payment to the defendant for the last shipment of Blanks. As a result, defendant will be allowed a set-off of the prayed for amount against the damages plaintiff shall recover in this action.
For the reasons stated above, judgment will be entered for the plaintiff on its complaint, and judgment will be entered for the defendant on its counterclaim.